IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| WILSON NUYILA TITA, et al., | * | Criminal No. CCB-21-334 |

...oOo...

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS COUNTS FOUR AND FIVE UNDER *BRUEN* (ECF NOS. 122, 123, 124)**

## INTRODUCTION

Contrary to the defense position, recent developments in Second Amendment jurisprudence have not changed the legal landscape relevant to this case. As such, this Court should reject the defendants' motions and affirm their convictions for possessing and transferring firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k) (Count Four) and smuggling firearms out of the country that are subject to export controls, in violation of 18 U.S.C. § 554 (Count Five).

First, as an initial matter, the defendants' motions must fail because their challenges are untimely under Fed. R. Crim. P. 12. Any such motions challenging the propriety of the § 922(k) charges had to be brought before trial or else they would be waived. Defendants do not even make any attempt to demonstrate any good cause for the failure to raise this issue sooner. As such, the Court should deny these motions under Rule 12 based on the defendants' waiver.

Second, even taking the defendants' challenge at face value, it still fails under the test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). The defendants' conduct here—possessing and exporting firearms with obliterated serial numbers to a foreign country—does not fit within the text of the Second Amendment. This Amendment

1

protects the right of individuals to "keep and bear" arms, not export them. Nor is there any "infringement" by simply requiring a serial number on a gun. Moreover, central to the Second Amendment's protections is the use of a firearms for one's own self-protection. That is not the case here inasmuch as the defendants were transferring firearms to others, not using them for their own self-protection.

Finally, even if the plain text of the Second Amendment covered the defendants' conduct (which it does not), the defendants' challenge still fails. From the Founding Era to today, governments have been regulating the sale, possession, and transfer of firearms. The Supreme Court has expressly indicated such provisions are permissible. In 2008, the Supreme Court made clear that its ruling was not intended to call into question long-standing prohibitions on "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Court reiterated this notion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). This is precisely what §§ 922(k) and 554 are: laws regarding the commercial sale and transfer of firearms. Accordingly, even under *Heller* and *Bruen*, the defendants' convictions under § 922(k) and § 554 must be affirmed.

For these reasons, the defendants' motions should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 17, 2022, a federal grand jury returned a superseding indictment against Defendants Wilson Nuyila Tita, Eric Fru Nji, and Wilson Che Fonguh, charging them with: (1) conspiracy to violate federal law, including the Arms Export Control Act ("AECA"), 22 U.S.C. § 2278 *et seq.*, the Export Control Reform Act ("ECRA"), 50 U.S.C. § 4801 *et seq.*, and 18 U.S.C. §§ 554 and 922(k) (Count One); (2) a substantive violation of the AECA (Count Two); (3) a substantive violation of the ECRA (Count Three); (4) transportation in interstate and foreign

commerce of firearms with obliterated serial numbers, in violation of 18 U.S.C. § 922(k) (Count Four); and (5) smuggling firearms subject to export controls from the United States to Nigeria, in violation of 18 U.S.C. § 554 (Count Five). ECF 44.

No defendant filed any motion to dismiss any of the counts in the superseding indictment prior to trial. Nor were any motions to dismiss filed as to the initial indictment (ECF 1) which charged the defendant with substantially the same versions of Counts One, Two, Three, and Four of the superseding indictment.

The matter proceeded to trial. On May 6, 2022, the jury found the defendants guilty as to Counts One, Four, and Five, and not guilty as to Counts Three and Four. ECF 108.

Then, on July 18, 2022, more than two months after their convictions, the defendants filed motions to dismiss Counts Four and Five, claiming their conduct was protected by the Second Amendment as defined by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF 122, 123, 124.[1]

As detailed below, these motions are procedurally barred and legally meritless.

## ARGUMENT

**A.    The Defendants' Motions To Dismiss Are Procedurally Barred Under Fed. R. Crim. P. 12**

The Federal Rules of Criminal Procedure provide that a defect in the indictment, including the failure of a charge to state a claim, is a defense that "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). A defendant's failure to move to

---

[1] Because the defendants have raised a discrete Second Amendment issue here that requires a separate analysis from the other grounds in their motions, the government here submits a separate brief just related to the Second Amendment challenges. A response brief dealing with the other arguments for a new trial will be filed separately.

dismiss a count prior to trial constitutes a waiver of the claim, unless a showing of "good cause" is made. Fed. R. Crim. P. 12(c)(3).

Against these standards, the Fourth Circuit has consistently denied late-filed motions to dismiss charges in an indictment. *United States v. Mathis*, 932 F.3d 242, 257 (4th Cir. 2019) (affirming denial of late-filed motion to dismiss for allegedly defective indictment); *United States v. Nielsen*, 640 Fed. Appx. 224, 231 (4th Cir. 2016) (multiplicity claim was waived because it was not raised in pretrial motion).

Rule 12's strict waiver provisions apply even when the belated claim raises an issue of constitutional dimensions. *See Davis v. United States*, 411 U.S. 233, 238 & n.5 (1973) (defendant's constitutional challenge to grand jury venire was waived under Rule 12); *United States v. Reinoso*, 232 Fed. Appx. 294, 296 (4th Cir. 2007) ("We therefore conclude he has waived his right to assert his constitutional objections by failing to file a motion to suppress the evidence prior to trial.").

Here, the defendants were originally charged with Counts One, Two, Three, and Four in August 2021. They were charged in a superseding indictment that added Count Five in March 2022. And they were convicted in May 2022. At no point prior to their convictions did the defendants file a motion to dismiss as to any of the counts. They certainly did not raise any Second Amendment concerns as to Counts Four or Five. If they wanted to claim a defect in the charges and aver the failure of Counts Four and Five to state a claim under the Second Amendment, the defendants were obligated to raise the issue before trial. Fed. R. Crim. P. 12(b)(3)(B). By not doing so, the claims are waived. Moreover, the defendants proffer nothing in their motions to establish "good cause" to excuse their neglect. The arguments raised in *Bruen* were certainly available to them prior to trial. Indeed, *Heller* was decided in 2008. This

decision alone would have been sufficient to give them the roadmap to make their current claims. Moreover, the *Bruen* case was argued before the Supreme Court in November 2021, just a few months after the defendants were indicted. There was ample time and notice for the defendants to make a *Bruen*-like argument before trial. They simply chose not to do so. As such, they have waived the arguments they attempt to make here. *See United States v. Ruhe*, 191 F.3d 376, 386-87 (4th Cir. 1999) (holding that there was no good cause to raise an untimely suppression motion when the defendant could have with due diligence discovered the information necessary to raise the issue).

**B.     Defendants' Challenges Under The Second Amendment Are Meritless**

Alternatively, even considering the defendants' Second Amendment challenges to their convictions on the merits, they still fail.

The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Fourteen years ago, the Supreme Court concluded that the Second Amendment confers an "individual right to keep and bear arms in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) ("Heller"). The "central" aspect of this right is the "right to self-defense." *Id.* at 628. The Court noted, however, that, as with other fundamental rights, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court further noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* In fact, according to the Court, such

restrictions are "presumptively lawful regulatory measures" and that this list is not exhaustive. *Id.* at 627 n.26.

The Court recently elaborated on the framework of Second Amendment analysis in *Bruen*. In that case, the Court analyzed the constitutionality of a New York firearm licensing scheme wherein an applicant was required to prove that she had "proper cause" to carry a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2123. The Court struck down the "proper cause" requirement as too subjective and violative of the Second Amendment. *Id.* at 2156.

In reaching this conclusion, the Court laid out the proper analytical framework for determining whether a firearm regulation is constitutional under the Second Amendment. Courts "assess whether modem firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. To make this assessment, a court must engage in a two-prong analysis. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does not, the analysis ends, and the Government's regulation is valid. If the conduct at issue is covered by the Amendment's text, however, the Government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the Second Amendment's protections. *Id.* In conducting this historical analysis, the Court recognized that the government need not present a one-to-one comparison between regulations in existence in 1791 and those at issue in the present litigation. Rather, the government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era. *Id.* at 2132. In this way, the test in *Bruen* only requires a showing

of a historical example that is "relevantly similar" to the current regulation; the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

Having laid out the Supreme Court's Second Amendment framework, the government now demonstrates how the prohibitions in 18 U.S.C. §§ 922(k) and 554 are perfectly constitutional and hence the defendants' arguments must be rejected.

### 1. The Second Amendment's Text Does Not Reach The Defendants' Conduct

The defendants' challenge fails at the first step of the *Bruen* analysis because the text of the Second Amendment does not cover their conduct or the statutes under which they were charged. This is because: (a) the defendants were not convicted for their attempts to "keep and bear arms;" (b) the serial number requirement does nothing to "infringe" on the right to bear arms; (c) the defendants were not acting as "the people" to whom Second Amendment rights are guaranteed; and (d) the defendants were not engaged in activity that is central to the Amendment's protections, namely, the exercise of self-defense. Each of these grounds will be explored below.

First, while the Second Amendment is designed to protect the people's ability to "keep and bear arms," the statute at issue here requiring a serial number creates no imposition on these rights. Nor indeed does the defendants' offense conduct have anything to do with their attempts to "keep and bear" arms. As the Supreme Court made clear, to "keep" means to "'[t]o retain; not to lose,' and '[t]o have in custody' and to 'have.'" *Heller*, 554 U.S. at 582 (citation omitted). Patently, here, the defendants were not trying to "keep" arms; they were trying to export and smuggle them to Nigeria. Similarly, whether a serial number is on a gun or not has nothing to do with retention of the gun. So, the term "keep" is surely not implicated here.

Nor is the term "bear arms" at issue here. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. Here, the defendants were not trying to "bear" arms; again, they were trying to smuggle them out of the country. They were engaged in an unlawful scheme to export rifles, ammunition, and rifle scopes to Nigeria without proper licensing and authorization. ECF 44. Some of these rifles had obliterated serial numbers, which were used to camouflage their unlawful sale of these guns and evade the kind of licensing and regulations that would ordinarily apply to the lawful commercial sales of firearms which have proper serial numbers. In this way, the defendants here were not attempting to "bear arms;" they were in fact doing the opposite by shipping them away. Hence, the regulations in §§ 922(k) and 554 do not implicate the Second Amendment's text at all.

This finding is buttressed by the Third Circuit's decision in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). In that case, the court aptly noted that "unmarked firearms are functionally no different from marked firearms." *Id.* at 94. In this way, the mere requirement that a firearm have a serial number or that it not be smuggled out of the country does not impose any burden on one's ability to "keep and bear arms."

Second, and relatedly, the Second Amendment only proscribes laws that "infringe" on the protected right to "keep and bear arms." But here, there is nothing about § 922(k) that infringes. Again, as the Third Circuit remarked, "Section 922(k) did not bar Marzzarella from possessing any otherwise lawful marked firearm for the purpose of self-defense, and a person is just as capable of defending himself with a marked firearm as with an unmarked firearm. With or without a serial number, a pistol is still a pistol." 614 F.3d at 94. The lack of any infringement on the core Second Amendment right further places these statutes outside the text of what the Second Amendment covers.

Third, the defendants here cannot claim to be the "people" to whom Second Amendment rights are guaranteed. As the Supreme Court has made clear, "the people" refers only to "law-abiding citizens" who are using firearms for "lawful purposes." *Heller*, 554 U.S. at 625; *accord Bruen*, 142 S. Ct. at 2122 (the Second Amendment right is limited to "law-abiding" citizens seeking to execute a "lawful purpose"). Here, defendants were not acting as law-abiding citizens; they were law-evading. Moreover, they were not convicted for using firearms for a "lawful purpose;" rather, they were smuggling guns out of the country contrary to our export laws. As the Third Circuit noted in *Marzarella*, "[the defendant] does not assert, any lawful purpose served by obliterating a serial number on a firearm. Because a firearm with a serial number is equally effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm. These weapons would then have value primarily for persons seeking to use them for illicit purposes." *Id.* at 95. The same logic applies here. There is nothing "law-abiding" about possessing and transferring guns with obliterated serial numbers. The only purpose of such guns is to evade law enforcement and engage in illicit activities. Because the defendants' possession of the guns with obliterated serial numbers were not for a "lawful purpose," the conduct is outside the ambit of the Second Amendment's text.

A look at Supreme Court further confirms as much. In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court reversed the dismissal of an indictment of two men for transporting an *unregistered* short-barreled shotgun in interstate commerce, in violation of then 28 U.S.C. § 1332(c) and (d). 307 U.S. at 175. The Court held the shotgun was unprotected by the Second Amendment. *Id.* at 178. In *Heller*, the Court explained that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain

9

types of weapons," 128 S. Ct. at 2814, and that the Second Amendment only covers the kinds of weapons that "law-abiding citizens" would have had during the Founding Era. *Id.* In this way, *Heller* did not overrule *Miller*; rather, *Miller* stands for the proposition that "law-abiding citizens" would not have had unregistered firearms. And here, the defendants were convicted of the transportation of firearms with obliterated serial numbers, which meant they could evade registration requirements. In this way, the defendants were not acting as "law-abiding" citizens exercising constitutional rights; rather, they were trafficking in firearms with obliterated serial numbers precisely to avoid legal gun tracing requirements.

Fourth and finally, the defendants' conduct was not covered by the text of the Second Amendment because their conduct had nothing to do with their own self-defense. The use of a firearm for self-defense is the "central" facet the Second Amendment is designed to protect. *Heller*, 554 U.S. at 628. As the *Marzzarella* Court aptly noted, "[b]ecause the presence of a serial number does not impair the use or functioning of a weapon in any way, the burden on Marzzarella's ability to defend himself is arguably de minimis. Section 922(k) did not bar Marzzarella from possessing any otherwise lawful marked firearm for the purpose of self-defense, and a person is just as capable of defending himself with a marked firearm as with an unmarked firearm. With or without a serial number, a pistol is still a pistol." 614 F.3d at 94.[2] In this way, the serial number requirement does not infringe any right to self-defense, and hence the defendants' conduct is not squarely within the text of what the Second Amendment was designed to protect.

---

[2] It should be noted that *Marzzarella* affirmed the constitutionality of 922(k) under a means-end balancing test. This kind of balancing is no longer permitted under *Bruen*. However, the government submits that the outcome in *Marzzarella* would be the same post-*Bruen* and hence its analysis should still be seen as persuasive authority, even if it partially relied on a now-outdated balancing test.

10

In sum, when evaluating the statutes at issue and the offense conduct, the text of the Second Amendment provides the defendants no refuge. As such, the defendants' challenge fails under the first prong of *Bruen*, and hence this Court should affirm the convictions.

### 2. The Provisions Of 18 U.S.C. §§ 922(k) and 554 Coincide With Historically-Imposed Firearm Regulations

Even if the defendants' conduct as charged in Counts Four and Five were covered by the text of the Second Amendment, their challenges still fail because there have been proscriptions on the commercial sale and transport of firearms since the Founding Era. Specifically, in *Heller*, the Supreme Court specifically provided that its ruling would not call into question regulations on the "commercial sale of firearms." *Heller*, 554 U.S. at 626. This example was included in a laundry list of "long-standing" prohibitions that were to be considered "presumptively valid" because of the historical recognition and vintage. And the Court included that its list was not exhaustive. Sections 922(k) and 554 are clearly statutes affecting, and relating to, the commercial sale of firearms. This should end the matter.

In fact, Sections 922(k) and 554 are just a part of a wide range of federal restrictions on commerce in firearms. For example, a person must obtain a federal license before engaging in the business of importing, manufacturing, or dealing in firearms. 18 U.S.C. § 922(a)(1)(A). A license-holder may not sell certain types of guns to a person who resides in a different state. *Id.* § 922(b)(3). A license-holder must also maintain records of its activities. *Id.* § 923(g). Because the Court has recognized these kind of regulations on the commercial sale of firearms are permissible, the defendants' motions should be dismissed.

But even delving deeper into historical sources under the second prong of the test in *Bruen*, it is clear that Sections 922(k) and 554 are permissible and consistent with long-standing firearm regulations going back to the Founding Era. Courts have recognized that "colonial

11

governments substantially controlled the firearms trade." *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017).  Scholars have noted that many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms.

For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals. . . . . A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.' . . . In the 1800s, three southern states imposed taxes on personally held firearms."  Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017), attached as Exhibit 1; *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership.  Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the established social order."), attached as Exhibit 2; *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009) ("The Founders did have gun control. They had mandatory musters. Everyone with a gun had to show up and register their firearm . . . ."), attached as Exhibit 3.

Similarly, and as especially relevant to the anti-smuggling provisions in Section 554, in the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685.  Virginia likewise provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*."  *Id.* at 685 n.18 (emphasis added).  And other colonies "controlled the conditions of trade" in firearms.  *Id.*

at 685.

Further, and consistent with this Founding Era tradition, States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. Exhibit 1 (Spitzer article) at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.*

In sum, historical sources demonstrate a wide panoply of laws from the Founding Era which required firearm "registration" and which heavily regulated the sale and transfer of firearms, and particularly excluded sales outside the colony. These are historical analogues to the current serial number requirement and anti-smuggling provisions, which are necessary to, and in aid of, modern legislative schemes regulating the commercial sale of firearms.

And nothing in the defense submissions demonstrates otherwise. To the extent the defense claims that serial numbers are a modern advance in firearms not previously employed during the Founding Era, this is a distinction without a difference. The Supreme Court itself made the point that the Second Amendment was not cabined only to firearms actually in existence in 1791; rather, the protections applied to guns in modern usage. *Heller,* 554 U.S. at 582. In this way, the modern serial number development is no different than providing coverage to modern handguns (as opposed to only antique muskets). Moreover, *Bruen* has made clear that one-to-one matches are not required; the government need only show a relatively similar analogue, not a historical twin. As the above examples of gun registration and inspection statutes make clear, there are more than sufficient historical analogues for 922(k) and 554 to pass

muster, particularly when it is understood that these are regulations related to the commercial sale of firearms which the Supreme Court has said is the kind of law that is presumptively valid.

Further, to the extent the defendants claim their conduct was about transporting firearms out of the country and not necessarily selling them in commerce, this is another distinction without a difference. As the Supreme Court made clear in *Heller* and *Bruen*, courts must look for analogues. It is undeniable that regulations on the commercial sale of guns also approximate and are analogous to regulations on the mere non-commercial transfer of guns. And in any event, as detailed above, Founding Era laws regulated not just the commercial sale of firearms, but also regulated the ability to transfer firearms, separate and apart from in the confines of a sale for purchase. In this way, the defendants' transportation of firearms out of the country still falls squarely within what Founding Era laws proscribed.

Finally, to the extent defendants argue that "it does not appear that any law or regulation existed at the time the Second Amendment was ratified that banned transporting or donating firearms," ECF 123 at 7, that averment is flat wrong. The above sources indicate a wide panoply of Founding Era laws that are close analogues to Section 922(k) and 554. As such, even under the test enunciated by *Bruen*, the defendants' convictions must stand.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' motions to dismiss Counts Four and Five based on *Bruen*.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Jason D. Medinger
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on September 2, 2022, a copy of the foregoing Response was delivered via ECF to counsel for the Defendant.

            By: _____/s/_____
               Jason D. Medinger
               Assistant United States Attorney